NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3416-15T1
A-4384-15T1
A-4385-15T1
A-4386-15T1
A-4387-15T1
A-4388-15T1
A-4398-15T1

IN RE RENEWAL APPLICATION
OF TEAM ACADEMY CHARTER
SCHOOL.

IN RE RENEWAL APPLICATION
OF ROBERT TREAT ACADEMY
CHARTER SCHOOL.

IN RE RENEWAL APPLICATION
OF NORTH STAR ACADEMY
CHARTER SCHOOL OF NEWARK.

IN RE AMENDMENT REQUEST
TO INCREASE ENROLLMENT OF
MARIA L. VARISCO-ROGERS
CHARTER SCHOOL.

IN RE AMENDMENT REQUEST
TO INCREASE ENROLLMENT OF
UNIVERSITY HEIGHTS CHARTER
SCHOOL.

IN RE AMENDMENT REQUEST
TO INCREASE ENROLLMENT
OF GREAT OAKS LEGACY
CHARTER SCHOOL.

APPROVED FOR PUBLICATION

May 7, 2019

APPELLATE DIVISION

IN RE AMENDMENT REQUEST
TO INCREASE ENROLLMENT
OF NEW HORIZONS COMMUNITY
CHARTER SCHOOL.

_____

Argued January 16, 2019 – Decided May 7, 2019

Before Judges Alvarez, Nugent, and Mawla.

On appeal from the New Jersey Department of Education.

David G. Sciarra argued the cause for appellant Education Law Center (Pashman Stein Walder Hayden, PC and Education Law Center, attorneys; Michael S. Stein, Brendan M. Walsh, Ranit S. Shiff, David G. Sciarra, Elizabeth A. Athos, and Jessica A. Levin, on the briefs).

Thomas O. Johnston argued the cause for respondents TEAM Academy Charter School, Robert Treat Academy Charter School, North Star Academy Charter School of Newark, University Heights Charter School, Great Oaks Legacy Charter School, and New Horizons Community Charter School (Johnston Law Firm LLC, attorneys; Thomas O. Johnston, of counsel and on the brief; Rula Alzadon Moor, on the brief).

Adam S. Herman argued the cause for respondent Maria L. Varisco-Rogers Charter School (Adams Gutierrez & Lattiboudere, LLC, attorneys; Adam S. Herman, of counsel and on the brief; Daniel A. Schlein, on the brief).

Geoffrey N. Stark, Deputy Attorney General, argued the cause for respondent Commissioner of Education (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Geoffrey N. Stark, on the brief).

2 A-3416-15T1

The opinion of the court was delivered by

ALVAREZ, P.J.A.D.

The Education Law Center (ELC), on behalf of Abbott[1] school children, appeals the Commissioner of Education's (Commissioner) February 18, 2016 and February 29, 2016 final decisions approving increases in enrollment and expansions of physical plants for seven Newark charter schools. The schools and the Commissioner are the respondents. We affirm.

## I.

ELC is a non-profit organization which, for many years, has litigated on behalf of children in the State's poorest school districts. Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 279 (2009). Abbott school children, whom ELC claims to represent in this case, include the residents of thirty-one urban school districts in New Jersey that the Supreme Court long ago found were not receiving the "thorough and efficient" education guaranteed by our State Constitution. Abbott II, 119 N.J. at 394. Efforts to extend to those students that basic right and to adequately fund the process, have sparked years of litigation and legislative action. See, for example, Abbott v. Burke (Abbott XXI), 206 N.J. 332, 340-41 (2011).

---

[1] Abbott v. Burke (Abbott II), 119 N.J. 287, 394 (1990).

The Newark School District (District), formerly an Abbott school district, is now a New Jersey Schools Development Authority (SDA) District. The designation guarantees particular benefits, such as 100% facilities funding. See Educational Facilities Construction and Financing Act (EFCFA), N.J.S.A. 18A:7G-1 to -48. For the school year 2013-2014, as cited by the seven charter schools in support of their applications, the District's sixty-four traditional schools had the following demographics:

| Demographic | Free or reduced price lunch | Special Ed. | LEP[2] | Asian | Black | Hispanic | White | Other Ethnic Group |
|---|---|---|---|---|---|---|---|---|
| Percentage | 84% | 18% | 9% | 1% | 51% | 40% | 8% | 0% |

The State Board of Education returned full operating authority to the District in 2018, after approximately twenty-three years. Shortly after the State's takeover of the District, the Legislature authorized the establishment of charter schools. The first one opened in Newark in 1997. As of the 2017-2018 school year, nineteen charter schools were open in the District. https://www.nj.gov/education/chartsch/ (last visited April 12, 2019). The Charter School Act (the Act), N.J.S.A. 18A:36A-1 to -18, defines an initial charter term as four years. The schools are required to renew for subsequent

---

[2] Limited English Proficiency student.

five-year periods. N.J.S.A. 18A:36A-17. The Act authorized "the establishment of not more than 135 charter schools during the 48 months following the effective date" of the law state-wide, with a minimum of three charter schools allocated to each county. N.J.S.A. 18A:36A-3(b). During that time, enrollment could not exceed "500 students or greater than 25% of the student body of the school district in which the charter school is established, whichever is less." N.J.S.A. 18A:36A-4(e). The Commissioner was directed to "actively encourage the establishment of charter schools in urban school districts with the participation of institutions of higher education." N.J.S.A. 18A:36A-3(b).

Charter schools are "open to all students on a space available basis[.]" N.J.S.A. 18A:36A-7. A charter school may not discriminate in its admissions policies and practices, but "may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts." Ibid. Preference for enrollment must be given to students who reside in the school district in which the charter school is located, and the school cannot charge tuition. N.J.S.A. 18A:36A-8(a). "If there are more applications to enroll in the charter school than there are spaces available, the charter school shall select students to attend using a random selection process." Ibid.

Funding for charter schools comes from the local school district, and state and federal aid, but is not equivalent to traditional public school per pupil funding. N.J.S.A. 18A:36A-12(b). At first, Charter School Senate Bill S. 1796, § 13 (1995), provided for 100% of the local levy budget per pupil. In re Grant of the Charter Sch. in re Englewood on the Palisades Charter Sch., 164 N.J. 316, 332 (2000). During the three public hearings conducted by the Senate and Assembly Education Committees on the proposed bill, "[t]he most frequently expressed objection was charter schools would divert tax dollars from existing districts without any corresponding decrease in their costs." In re Grant of Charter Sch. in re Englewood on Palisades Charter Sch., 320 N.J. Super. 174, 189-90 (App. Div. 1999), aff'd as modified, 164 N.J. 316 (2000). Therefore, the Legislature moderated the impact charter schools would have on funding for traditional public schools by reducing the per-pupil amount payable by the District to 90%. Englewood, 164 N.J. at 333; School Funding Reform Act of 2008 (SFRA), N.J.S.A. 18A:7F-43 to -63.

In addition to the concern regarding the financial impact charter schools have on traditional public schools, see In re Proposed Quest Academy Charter School of Montclair Founders Group, 216 N.J. 370, 377 (2013), the statute and the Supreme Court direct that in evaluating charter school applications, the Commissioner must consider "the racial impact that a charter school applicant

will have on the district of residence[.]" Ibid. (quoting Englewood, 164 N.J. at 329). Once an applicant makes the requisite preliminary showing, the Commissioner must also "evaluate carefully the impact that loss of funds would have on the ability of the district of residence to deliver a thorough and efficient education." Id. at 377-78 (quoting Englewood, 164 N.J. at 334-35).

The Commissioner annually assesses whether a charter school is meeting the goals of its charter. N.J.S.A. 18A:36A-16(a). The Commissioner also scrutinizes "the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence." N.J.A.C. 6A:11-2.2(c). To facilitate that review, charter schools must submit an annual report to the Commissioner, local board of education, and the county superintendent of schools. N.J.S.A. 18A:36A-16(b); N.J.A.C. 6A:11-2.2. The Commissioner may revoke a charter at any time if the school has not fulfilled or has violated any of the conditions of its charter. N.J.S.A. 18A:36A-17.

II.

Applications to renew a charter are governed by N.J.S.A. 18A:36A-17 and the implementing regulation, N.J.A.C. 6A:11-2.3. The Commissioner shall grant or deny the renewal based upon a comprehensive review of the school, including the annual reports, recommendation of the district board of education or school superintendent, and student performance on statewide

tests. N.J.A.C. 6A:11-2.3(b). "The notification to a charter school that is <u>not</u> granted a renewal shall include reasons for the denial." N.J.A.C. 6A:11-2.3(d) (emphasis added).

A charter school may also apply to the Commissioner for an amendment to the charter. N.J.A.C. 6A:11-2.6(a). The amendment, as in this case, can include an expansion of enrollment and the opening of new satellite campuses. N.J.A.C. 6A:11-2.6(a)(1)(i) and (iv).

Similar to the initial approval process, boards of education in the district of residence can submit comments in response to the amendment application. N.J.A.C. 6A:11-2.6(c). Furthermore, "[t]he Department shall determine whether the amendments are eligible for approval and shall evaluate the amendments based on" the Act and implementing regulations. N.J.A.C. 6A:11-2.6(b). "The Commissioner shall review a charter school's performance data in assessing the need for a possible charter amendment." <u>Ibid.</u> The Commissioner shall notify charter schools of the decision to approve or deny an amendment request. If approved, the amendment becomes effective immediately unless a different effective date is designated. N.J.A.C. 6A:11-2.6(d).

ELC appeals the Commissioner's decisions to approve the respondent schools' applications to expand their charters. ELC argues:

POINT I
THE COMMISSIONER VIOLATED HIS AFFIRMATIVE OBLIGATION TO EVALUATE THE IMPACT OF THE CHARTER SCHOOL APPLICATIONS FOR EXPANSION ON A THOROUGH AND EFFICIENT EDUCATION IN THE NEWARK DISTRICT.

A. The Commissioner Failed to Evaluate the Loss of the District Funding from the Proposed Charter School Expansions.

B. The Commissioner Failed to Evaluate the Segregative Effects of the Proposed Charter Expansions.

C. There is No Support in the Record for the Commissioner's Decisions to Approve the Charter Expansions.

POINT II
THE COMMISSIONER VIOLATED THE ACT BY APPROVING CHARTER EXPANSIONS REQUIRING MULTIPLE SCHOOLS UNDER ONE CHARTER.

III.

Preliminarily, respondents contend that ELC lacks standing to challenge the Commissioner's decision. "Standing 'refers to the plaintiff's ability or entitlement to maintain an action before the court.'" In re Adoption of Baby T, 160 N.J. 332, 340 (1999) (quoting N.J. Citizen Action v. Riveria Motel Corp., 296 N.J. Super. 402, 409 (App. Div. 1997)). Standing is a threshold issue that "neither depends on nor determines the merits of a plaintiff's claim." Watkins

v. Resorts Int'l Hotel & Casino, 124 N.J. 398, 417 (1991). "Unlike the Federal Constitution, there is no express language in New Jersey's Constitution which confines the exercise of our judicial power to actual cases and controversies. U.S. Const. art. III, § 2; N.J. Const. art. VI, § 1." Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107 (1971).

Our Courts do not, however, render advisory opinions, function in the abstract, or consider actions brought by plaintiffs who are "merely interlopers or strangers to the dispute." Ibid. (citation omitted). "To possess standing in a case, a party must present a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision." In re Camden Cty., 170 N.J. 439, 449 (2002) (citation omitted).

Insofar as standing to intervene in the charter school approval process, N.J.S.A. 18A:36A-4(d) provides only that "[t]he local board of education or a charter school applicant may appeal the decision of the commissioner to the Appellate Division of the Superior Court." Similarly, N.J.A.C. 6A:11-2.5, which governs the "charter appeal process," states: "[a]n eligible applicant for a charter school, a charter school, or a district board of education or State district superintendent of the district of residence of a charter school may file an appeal according to N.J.S.A. 18A:6-9.1." When a charter school board of

trustees' response to a complaint is unsatisfactory, an individual or group may "present that complaint to the commissioner who shall investigate and respond[.]" N.J.S.A. 18A:36A-15.

Only the district board of education and the charter school appear to have statutory standing to challenge the Commissioner's decisions. N.J.S.A. 18A:36A-4(d). ELC as an individual or group can present a complaint to a charter school's board of trustees, and then to the Commissioner, but has no express right to appeal the Commissioner's decisions. N.J.S.A. 18A:36A-15.

But our courts take "a liberal approach to standing to seek review of administrative actions[.]" In re Camden Cty., 170 N.J. at 448. "A party has standing to challenge an administrative agency's decision when the party has 'a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision.'" In re Grant of Charter to Merit Preparatory Charter Sch. of Newark, 435 N.J. Super. 273, 279 (App. Div. 2014) (quoting In re Camden Cty., 170 N.J. at 449).

"[W]hen an issue involves a 'great public interest, any slight additional private interest will be sufficient to afford standing.'" Ibid. (quoting Salorio v. Glaser, 82 N.J. 482, 491 (1980)). "'[I]t takes but slight private interest, added to and harmonizing with the public interest to support standing to sue.'"

People For Open Gov't v. Roberts, 397 N.J. Super. 502, 510 (App. Div. 2008) (quoting Hudson Bergen Cty. Retail Liquor Stores Ass'n v. Bd. of Comm'rs, 135 N.J.L. 502, 510 (E. & A. 1947)).

"[T]he standing of nonprofit associations to litigate in varying contexts has historically been upheld in New Jersey." In re Ass'n of Trial Lawyers of Am., 228 N.J. Super. 180, 185 (App. Div. 1988). Nonprofit organizations have representative standing to pursue claims on behalf of their members that are of "common interest" and could not more appropriately be pursued by individual members. Crescent Park Tenants Ass'n, 58 N.J. at 109.

The ELC, as a nonprofit law center, has historically represented the class of Abbott school children in the Abbott litigation, Abbott v. Burke (Abbott V), 153 N.J. 480, 527 (1998), and in ongoing litigation focused on funding for education to "the State's poorest school districts." Educ. Law Ctr., 198 N.J. at 279. It represents the class of students in poorer urban districts, including Newark, who might be prevented from receiving a thorough and efficient education as a result of the Commissioner's decisions. Therefore, it contends, it has a sufficient stake in the outcome.

Respondents argue it is improper to allow ELC standing because the members of the represented class include all of Newark's school children—a group including charter school students and those who wish to enroll, but

12

cannot because of lack of available space. Additionally, respondents further argue that allowing ELC to pursue the matter essentially permits individual students, contrary to N.J.S.A. 18A:36A-4(d), to appeal a decision by the Commissioner. Lastly, they assert that ELC should not be permitted to challenge the decision when the affected District does not oppose the proposed expansion.

ELC responds that the class of Abbott students it represents includes only traditional public school students, whose right to a thorough and efficient education is jeopardized by the Commissioner's action. Further, all District students, in charter schools or not, have a direct interest in obtaining adequate funding and in ameliorating the effect of student segregation within the District. Without its participation, traditional public school students would lose their voice, as the State cannot be expected to challenge its own decisions.

Given our State's goal of providing a thorough and efficient education to all public school students, ELC's standing seems clear. That the statute does not explicitly allow for organizations such as ELC to appeal the Commissioner's decisions is inconsequential. The unfortunate reality is that, despite systemic improvements, public school children in Abbott districts continue to need representation in order to ensure their constitutional right to a thorough and efficient education is enforced. At no time has the overall

statutory scheme regarding education expressly granted standing to entities such as ELC, yet ELC has over many years successfully litigated on behalf of New Jersey's school children. To coin a phrase, if not ELC, then who?

The issues raised in this appeal, notably the effect of a substantial increase in charter school enrollment on traditional schools in a former Abbott school district, are of "great public interest[.]" Merit Preparatory, 435 N.J. Super. at 279 (quoting Salorio, 82 N.J. at 491). Thus, even if ELC had demonstrated only a "slight additional private interest," it has standing. Ibid.

### IV.

Four of the charter schools, Great Oaks, University Heights, TEAM, and North Star, participate in a universal enrollment system in which students rank their preferred schools (both public and charter) and are then assigned pursuant to an algorithm overseen by the District. Students with the highest needs, that is, those who have an Individualized Education Program (IEP)[3] or are eligible for free lunch, are given greater preference to attend the school of their choice. There is no "cap"—the system does not stop filling seats with high needs students once a certain percentage of available seats have been filled. Students

---

[3] Disabilities of students with IEPs include a specific learning disability, communication impairment, intellectual disability, autism, other health impairments, an emotional disturbance, or those eligible for speech and language services.

have a neighborhood preference for grades pre-K through eighth (although that preference does not take priority over high-need student preferences), and preference is given for siblings of already-enrolled students. All of the charter schools have the ability to serve special needs and LEP or English Language Learners (ELL) students.

Newark's charter schools are party to a "Compact"[4] agreeing to serve "all students in the city, especially the highest need students requiring special education services, students who are [ELL], students who qualify for free or reduced-price lunch, and other underserved or at-risk populations[.]" Each of the schools, either through One Newark Enrolls, or through its own marketing and recruitment efforts, attempts to reach parents through their websites, flyers, ads, open houses, and billboards. The Department of Education (DOE) oversees the charter school's "access and equity" for "highest needs students."

The mere fact that the demographics of the charter schools do not mirror the demographics of the District does not alone establish a segregative effect.

---

[4] The Compact, which was forged by the Newark Charter School Fund, is available at https://ncsfund.org/schools (last visited April 23, 2019) and https://www.nj.gov/education/chartsch/equity/NewarkCharterCompact.pdf (last visited April 23, 2019). According to the Newark Charter School Fund's website, to date, five of the seven charter schools (Team, North Star, Treat, Great Oaks, and University Heights) have signed the Compact, while two schools have not (Varisco-Rogers and New Horizons). https://ncsfund.org/schools (last visited April 23, 2019).

See In re Red Bank Charter Sch., 367 N.J. Super. 462, 476-77 (App. Div. 2004). Thus, ELC has not created a record that demonstrates the schools engage in enrollment practices that worsen the District's racial, ethnic, or special needs balance.

## A. TEAM

The DOE ranks TEAM as a Tier 1 school based on its academic standings within the State's Academic Performance Framework for charter schools. Seventy-seven percent of its students attend college, and in 2014, the school "sent more African American students to college than any other high school in Newark." Its students outperform 62% of schools statewide and 83% of students from schools with similar demographics.

TEAM's October 15, 2015 application to renew its charter initially sought a maximum enrollment expansion from 4120 to 9560 students through the 2020-2021 school year. At the time, it served 3252 students in kindergarten through grade twelve, including 194 students from other school districts. It had 1891 students on its waiting list. It reported the following demographics for the 2015-2016 school year:

| Demographic | Free or reduced price lunch | Special Ed. | LEP | Asian | Black | Hispanic | White | Other Ethnic Groups |
|---|---|---|---|---|---|---|---|---|
| Percentage | 88% | 12% | ≤ 1% | ≤ 1% | 89% | 6% | ≤ 1% | 5% |

The District[5] opposed TEAM's request for expansion, but recommended an alternative outcome of partial approval: "State is requesting a revised expansion request with lower enrollment; net increase is based on straight articulation except backfill at [fif]th grade to 315." ELC opposes TEAM's enrollment expansion because it had not applied for an amendment to open a satellite location, and instead sought "substantial increases in enrollment over the next five years, to be accommodated in numerous new facilities in unidentified locations in the district."

By letter dated January 30, 2016, TEAM submitted a revised expansion request to 2696 new students, with a maximum enrollment of 6816 students. It also sought permission to open a fifth and sixth elementary school, a fourth middle school, and a second high school "in order to complete the existing feeder pattern for current students," but abandoned its request to seek approval to open a pre-kindergarten, a fifth and sixth middle school, and a third high school.

The Commissioner issued a final decision approving TEAM's application for renewal based on the DOE's comprehensive review of the school's "application, annual reports, student performance on state

---

[5] The Newark School District was a State-operated school district in 2015, when each of the seven charter schools at issue in this appeal applied for increases in enrollment.

assessments, site visit results, public comments, and other information[.]"  The

Commissioner found that the school, in operation for fourteen years, had

> a history of providing a high-quality education to its students.   From 2011-12 to 2013-14, the school received a Tier Rank of 1, the highest rank possible based on the standards within the Performance Framework.   In the 2014-15 school year, based on [Partnership Assessment of Readiness for Collect and Careers (PARCC)] results, the school outperformed its home district of Newark in English language arts in elementary, middle and high school.  Additionally, on January 30, 2016, the school submitted a letter revising its expansion request.

Based on the Commissioner's evaluation, he confirmed the school's

maximum approved enrollment, as follows:[6]

| Grade Level | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 |
|---|---|---|---|---|---|
| K | 480 | 600 | 720 | 720 | 720 |
| 1 | 480 | 600 | 720 | 720 | 720 |
| 2 | 480 | 600 | 720 | 720 | 720 |
| 3 | 480 | 600 | 720 | 720 | 720 |
| 4 | 480 | 600 | 720 | 720 | 720 |
| 5 | 360 | 480 | 600 | 720 | 720 |
| 6 | 360 | 480 | 480 | 600 | 720 |
| 7 | 360 | 480 | 480 | 480 | 600 |
| 8 | 360 | 480 | 480 | 480 | 480 |
| 9 | 211 | 360 | 480 | 480 | 480 |
| 10 | 182 | 211 | 360 | 480 | 480 |
| 11 | 155 | 182 | 211 | 360 | 480 |
| 12 | 137 | 155 | 182 | 211 | 360 |
| **Total** | **4525** | **5828** | **6873** | **7411** | **7920** |

---

[6]  It is not clear from the record why the above configuration included in the commissioner's February 18, 2016 renewal letter differs so substantially from TEAM's January 30, 2016 revised expansion request.   Notwithstanding, appellant only challenges expansion generally and does not focus on these specific numbers.

## B.  NORTH STAR

North Star is classified as a Tier 1 school.  Its students have consistently outperformed other students in the District across all grade levels, and it has a science partnership for high school seniors with Seton Hall University and other local universities.

When North Star submitted its charter renewal application on October 15, 2015, it served 3998 students in kindergarten through twelfth grade, with a maximum enrollment of 4950, and operated eleven campuses in Newark, with three more campuses scheduled to open beginning in the 2016-2017 school year.  It had 2535 students on its waiting list.  It reported the following demographics for the 2015-2016 school year:

| Demographic | Free or reduced price lunch | Special Ed. | LEP | Asian | Black | Hispanic | White | Other Ethnic Groups |
|---|---|---|---|---|---|---|---|---|
| Percentage | 85.5% | 8.4% | 0.4% | 0.4% | 84.6% | 8.7% | 2.0% | 4.4% |

North Star proposed expansion of maximum enrollment from 4950 to 6216 students through the 2020-2021 school year, with 540 students in each of grades kindergarten through eighth.  After discussions with the DOE, North Star revised the maximum enrollment expansion to 6550 students by the school year 2020-2021, noting that the 540 seats in kindergarten through fifth grade had previously been approved during the 2010 charter renewal.

The District did not offer a recommendation regarding North Star's application, noting only that, "[n]et increase based on [kindergarten] increase of 90, net [fif]th [grade] increase to 540 (as requested), remaining grades articulate upward."

The Commissioner's final decision approved North Star's application for renewal based on the DOE's comprehensive review of the school's "application, annual reports, student performance on state assessments, site visit results, public comments, and other information[.]" The Commissioner found that the school, in operation for nineteen years, had

> a history of providing a high-quality education to its students. From 2011-12 to 2013-14, the school received a Tier Rank of 1, the highest rank possible based on the standards within the Performance Framework. In the 2014-15 school year, based on PARCC results, the school outperformed both the state and its home district of Newark in English language arts and in mathematics in elementary, middle and high school. Through the renewal process, it has been determined that the school is performing well academically and is organizationally and fiscally sound.

The Commissioner thus approved the following maximum enrollment:

| Grade Level | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 |
|---|---|---|---|---|---|
| K | 540 | 540 | 540 | 540 | 540 |
| 1 | 450 | 540 | 540 | 540 | 540 |
| 2 | 450 | 450 | 540 | 540 | 540 |
| 3 | 426 | 450 | 450 | 540 | 540 |
| 4 | 425 | 426 | 450 | 450 | 540 |
| 5 | 540 | 540 | 540 | 540 | 540 |
| 6 | 450 | 540 | 540 | 540 | 540 |

| | | | | | |
|---|---|---|---|---|---|
| 7 | 360 | 450 | 540 | 540 | 540 |
| 8 | 340 | 360 | 450 | 540 | 540 |
| 9 | 312 | 340 | 360 | 450 | 540 |
| 10 | 193 | 312 | 340 | 360 | 450 |
| 11 | 140 | 193 | 312 | 340 | 360 |
| 12 | 86 | 140 | 193 | 312 | 340 |
| **Total** | **4712** | **5281** | **5795** | **6232** | **6550** |

## C.  ROBERT TREAT

Robert Treat, a Tier 1 school, applied for renewal of its charter on October 15, 2016.  At the time of the application, Robert Treat served 651 students in grades kindergarten through eighth grade, with a maximum approved enrollment of 695.  It had 898 students on its waiting list, and reported the following demographics for the 2015-2016 school year:

| Demographic | Free or reduced price lunch | Special Ed. | LEP | Asian | Black | Hispanic | White | Other Ethnic Groups |
|---|---|---|---|---|---|---|---|---|
| Percentage | 74% | 6% | 0.5% | 1% | 33% | 60% | 4% | 2% |

Robert Treat sought to expand from 695 students for the 2015-2016 school year, to 860 students for the 2020-2021 school year, conditioned on relocation of the school.

The District recommended approval, noting a "[n]et increase in [2016-2017] due to straight articulation; [r]ecommend approval of [2017-2018] expansion request only for [kindergarten]."

The Commissioner approved Robert Treat's application based on the DOE's comprehensive review of the school's "application, annual reports,

student performance on state assessments, site visit results, public comments, and other information."  The Commissioner found that Robert Treat had a

> history of providing a high-quality education to its students.   From 2012-13 to 2013-14, the school received a Tier Rank of 1, the highest rank possible based on the standards within the Performance Framework.  In the 2014-15 school year, based on PARCC results, the school outperformed both the state and its home district of Newark in English language arts and in mathematics on PARCC in elementary and middle high school.  Through the renewal process, it has been determined that the school is performing well academically and is organizationally and fiscally sound.

The Commissioner confirmed the maximum approved enrollment, as follows:

| Grade Level | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 |
|:---:|:---:|:---:|:---:|:---:|:---:|
| K | 80 | 108 | 108 | 108 | 108 |
| 1 | 80 | 108 | 108 | 108 | 108 |
| 2 | 80 | 80 | 108 | 108 | 108 |
| 3 | 80 | 80 | 80 | 108 | 108 |
| 4 | 80 | 80 | 80 | 80 | 108 |
| 5 | 80 | 80 | 80 | 80 | 80 |
| 6 | 80 | 80 | 80 | 80 | 80 |
| 7 | 80 | 80 | 80 | 80 | 80 |
| 8 | 80 | 80 | 80 | 80 | 80 |
| **Total** | **720** | **776** | **804** | **832** | **860** |

## D. VARISCO-ROGERS

Varisco-Rogers, also a Tier 1 school, serves 484 students in kindergarten through eighth grade and has a waiting list of 529 students.  It is a high performing school, and for grade levels third through eighth, its students outperformed the District in both math and language arts literacy.  The school

22

utilizes two teachers in each classroom to maintain a ten-to-one student-teacher ratio. It reported the following demographics for the 2013-2014 school year:

| Demographic | Free or reduced price lunch | Special Ed. | LEP | Asian | Black | Hispanic | White | Other Ethnic Groups |
|---|---|---|---|---|---|---|---|---|
| Percentage | 83% | 6% | 6% | 5% | 13% | 81% | 1% | 0% |

On December 8, 2015, Varisco-Rogers submitted an application pursuant to N.J.A.C. 6A:11-2.6(a)(2)(ii), to amend its charter to increase enrollment for the 2016-2017 school year to sixty students in each grade, for a maximum enrollment of 540 students. It represented the increase was necessary to meet the growing needs of the community and to offer more students with an opportunity for school choice. The District recommended full approval of the expansion.

The Commissioner issued a final decision approving Varisco-Rogers's application for expansion based on the DOE's review of the school's "academic, operational, and fiscal standing as well as an analysis of public comments, fiscal impact on sending districts, and other information[.]" The Commissioner found that Varisco-Rogers had

> a history of providing a high-quality education to its students. In the 2012-13 and 2013-14 school years, the school received a Tier Rank of 1, the highest rank possible based on the standards within the

Performance Framework. In the 2014-15 school year, based on PARCC results, the school significantly outperformed its home district of Newark in English language arts and in mathematics in elementary and middle high school.

The Commissioner confirmed the maximum approved enrollment as follows:

| Grade Level | 2016-2017 | 2017-2018 |
|---|---|---|
| K | 60 | 60 |
| 1 | 60 | 60 |
| 2 | 60 | 60 |
| 3 | 60 | 60 |
| 4 | 60 | 60 |
| 5 | 60 | 60 |
| 6 | 60 | 60 |
| 7 | 60 | 60 |
| 8 | 60 | 60 |
| **Total** | **540** | **540** |

## E. UNIVERSITY HEIGHTS

University Heights is a Tier 2 school, serving 545 students in kindergarten through eighth grade. Beginning in 2014, its proficiency rates did not show an overall increasing trend in testing measures for mathematics and language arts. The school attributes those difficulties to its implementation of a blended educational program. It reported the following demographics for the 2013-2014 school year:

| Demographic | Free or reduced price lunch | Special Ed. | LEP | Asian | Black | Hispanic | White | Other Ethnic Groups |
|---|---|---|---|---|---|---|---|---|
| Percentage | 96% | 9% | 1% | 0% | 88% | 12% | 0% | 0% |

On November 25, 2015, University Heights requested an amendment to its charter to increase its enrollment over the next four years from two schools with 750 students, to four schools with 1500 students; it estimated it would need two additional facilities to accommodate the expansion. In support of the increase, it cited to its students' achievement, strong family demand, high need demographics, successful track record, distinctive contributions to Newark's portfolio of school choice, developed core academic model, deep bench of human capital, and demonstrated commitment to serve special needs students.

The District recommended partial approval of an alternative outcome, that is, the approval of the expansion in pre-K and kindergarten to 100 students, and denial of expansion in fifth grade. The Commissioner approved University Heights's application, with some limitations, based on the DOE's review of the school's "academic, operational, and fiscal standing as well as an analysis of public comments, fiscal impact on sending districts, and other information[.]"

The Commissioner found that the school had a

> history of providing a high-quality education to its students. In the 2014-15 school year, based on PARCC results, the school outperformed its home district of Newark in English language arts in elementary and middle school. In mathematics, the school outperformed the Newark school district in the elementary grades but underperformed the district in middle school. The Department also reviewed the

school's submission, which included detailed information regarding the proposed expansion.

Nonetheless, the Commissioner limited the maximum enrollment:

| Grade Level | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|
| Pre-K | 75 | 75 | 75 | 75 |
| K | 150 | 150 | 150 | 150 |
| 1 | 75 | 150 | 150 | 150 |
| 2 | 75 | 75 | 150 | 150 |
| 3 | 75 | 75 | 75 | 150 |
| 4 | 75 | 75 | 75 | 75 |
| 5 | 75 | 75 | 75 | 75 |
| 6 | 50 | 75 | 75 | 75 |
| 7 | 50 | 50 | 75 | 75 |
| 8 | 50 | 50 | 50 | 75 |
| **Total** | **750** | **850** | **950** | **1050** |

## F. GREAT OAKS

Great Oaks is a Tier 1 school serving 333 students in grades six through twelve. For the 2015-2016 school year, it had 1181 applicants but space for only 462 students. Its students consistently outperformed the District across grade levels. It reported the following demographics for the 2013-2014 school year:

| Demographic | Free or reduced price lunch | Special Ed. | LEP | Asian | Black | Hispanic | White | Other Ethnic Groups |
|---|---|---|---|---|---|---|---|---|
| Percentage | 67% | 13% | 0% | 0% | 82% | 17% | 0% | 1% |

Great Oaks sought to amend its charter to add a second middle school campus and to increase enrollment by approximately 100 students per grade level, or from 462 to 939 students through the 2019-2020 school year. The

impetus for the application was "parent demand for more seats and ultimately [to] allow the high school to be fully enrolled with Great Oaks students from the two middle school campuses[.]" It also represented it had "made significant investments in leadership development to prepare for the expansion and sustainability of a leadership pipeline for the future of the school." Additionally, nineteen out of thirty-six of its staff members reside in Newark, which, by design, cultivated commitment to the community.

The District recommended partial approval of the request, expansion at sixth grade to only 125 students, not 177 students, and the "straight articulation of [the] remaining grades[.]" Nonetheless, the Commissioner issued a final decision approving Great Oak's request based on the DOE's "review of its academic, operational, and fiscal standing as well as an analysis of public comments, fiscal impact on sending districts, and other information[.]" The Commissioner found that Great Oaks had a

> history of providing a high-quality education to its students. In the 2012-13 and 2013-14 school year, the school received a Tier Rank of 1, the highest rank possible based on the standards within the Performance Framework. In the 2014-15 school year, based on PARCC results, the school significantly outperformed its home district of Newark in English language arts and in mathematics in middle school and high school.

The Commissioner confirmed the following maximum approved enrollment:

| Grade Level | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|
| 6 | 177 | 177 | 177 | 177 |
| 7 | 77 | 177 | 177 | 177 |
| 8 | 77 | 77 | 177 | 177 |
| 9 | 77 | 77 | 77 | 177 |
| 10 | 77 | 77 | 77 | 77 |
| 11 | 77 | 77 | 77 | 77 |
| 12 | 77 | 77 | 77 | 77 |
| **Total** | **639** | **739** | **839** | **939** |

## G. NEW HORIZONS

New Horizons is a Tier 1 school serving 480 students in kindergarten through fifth grade. Its students outperformed the District in mathematics and language arts. It reported the following demographics for the 2013-2014 school year:

| Demographic | Free or reduced price lunch | Special Ed. | LEP | Asian | Black | Hispanic | White | Other Ethnic Groups |
|---|---|---|---|---|---|---|---|---|
| Percentage | 96% | 8% | 0% | 0% | 93% | 7% | 0% | 0% |

New Horizons requested amendment to its charter to increase maximum enrollment from 504 to 756 students to serve grades sixth, seventh, and eighth for the 2016-2017 school year. The request was based on a significant decrease in fifth grade enrollment because parents chose to enroll their children in schools that offered higher grades levels. Further, beginning in 2002, parents had petitioned for expansion to grades sixth, seventh, and eighth.

28

In anticipation of that expansion, New Horizons had received permits for the construction of a new facility and had added a new wing to provide students with state of the art learning materials.

The District recommended denial of the request for expansion based on New Horizons students' unimpressive results on the PARCC tests, but a partial approval of an alternative outcome, that is, expansion to serve sixth grade only.

The Commissioner partially approved New Horizons' request based on the DOE's "review of its academic, operational, and fiscal standing as well as an analysis of public comments, fiscal impact on sending districts, and other information[.]" The Commissioner found that New Horizons had

> a history of providing a high-quality education to its students. In the 2012-13 and 2013-14 school year, the school received a Tier Rank of 1, the highest rank possible based on the standards within the Performance Framework. In the 2014-15 school year, based on PARCC results, the school outperformed its home district of Newark in English language arts and in mathematics in elementary and middle school.

The Commissioner limited the school's expansion to one additional grade level each year and thus confirmed the following maximum approved enrollment:

29

| Grade Level | 2016-2017 | 2017-2018 |
| --- | --- | --- |
| K | 84 | 84 |
| 1 | 84 | 84 |
| 2 | 84 | 84 |
| 3 | 84 | 84 |
| 4 | 84 | 84 |
| 5 | 84 | 84 |
| 6 | 84 | 84 |
| 7 | | 84 |
| Total | 588 | 672 |

V.

ELC's main contention is the Commissioner failed to address overwhelming proof the expansions would severely impair the District's ability to deliver a thorough and efficient education. ELC argues the decisions were arbitrary, capricious, and unreasonable because they lacked detailed consideration of the effect the approvals would have on funding for District students remaining in traditional public schools, as well as the segregative effects—leaving the District with high concentrations of students with disabilities and English language needs.

Since the charter school population in Newark has nearly tripled since 2008, from 4559 to 12,885, ELC contends when the current expansion of 8499 students is complete over the next five years, approximately 50% of the District's current total enrollment will be made up of charter school students. In support, ELC relies upon an internal budget report it generated regarding the lack of full funding in the District in the 2011-2012 school year and thereafter. ELC also relies upon a Rutgers University report noting that the

A-3416-15T1

State's charter schools were overwhelmingly concentrated in seven urban communities, serving a population demographically different than the host district.

It is undisputed that failure to consider all the evidence in the record "would perforce lead to arbitrary decision making." Quest Acad., 216 N.J. at 386. A decision based on misperception of the facts "would render the agency's conclusions unreasonable." Id. at 387.

"[T]he standard for judicial review of administrative agency action is limited: An appellate court may reverse an agency decision if it is arbitrary, capricious, or unreasonable." Id. at 385. Our role in reviewing an agency action is restricted to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

"[T]he arbitrary, capricious, or unreasonable standard . . . subsumes the need to find sufficient support in the record to sustain the decision reached by the Commissioner." Id. at 386.

However, "[w]hen the Commissioner is not acting in a quasi-judicial capacity," and is instead acting in his legislative capacity, as he was doing here, he "need not provide the kind of formalized findings and conclusions necessary in the traditional contested case." Englewood, 320 N.J. Super. at 217 (citing Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. State Bd. of Educ., 172 N.J. Super. 547, 551-52 (App. Div. 1980)); see Red Bank, 367 N.J. Super. at 476 (Commissioner was acting in his legislative, not quasi-judicial capacity, in investigating a charter-school renewal application).

The applicable arbitrary, capricious, or unreasonable standard, however, demands only "that the reasons for the decision be discernible, the reasons need not be as detailed or formalized as an agency adjudication of disputed facts; they need only be inferable from the record considered by the agency." Englewood, 320 N.J. Super. at 217; see Red Bank, 367 N.J. Super. at 476 ("the reasons for the decision need not be detailed or formalized, but must be discernible from the record"); E. Windsor, 172 N.J. Super. at 552 (explaining detailed findings of fact not required by Commissioner in reducing amount local school board sought to increase its budget).

VI.

Funding for charter schools is provided by "the school district of residence[,]" which pays the charter school directly 90% of its program budget

per pupil for each of its resident students enrolled in the school. N.J.S.A. 18A:36A-12(b). Despite the statute's limit on funding:

> if the local school district "demonstrates with some specificity that the constitutional requirements of a thorough and efficient education would be jeopardized by [the district's] loss" of the funds to be allocated to a charter school, "the Commissioner is obligated to evaluate carefully the impact that loss of funds would have on the ability of the district of residence to deliver a thorough and efficient education."
>
> [Quest Acad., 216 N.J. at 377-78 (quoting Englewood, 164 N.J. at 334-35).]

"[T]he District must be able to support its assertions." Englewood, 164 N.J. at 336.

The Commissioner does not, however, have "the burden of canvassing the financial condition of the district of residence in order to determine its ability to adjust to the per-pupil loss upon approval of the charter school based on unsubstantiated, generalized protests." Ibid. "[T]he Commissioner is entitled to rely on the district of residence to come forward with a preliminary showing that the requirements of a thorough and efficient education cannot be met." Id. at 334. "The legislative will to allow charter schools and to advance their goals suggests our approach which favors the charter school unless reliable information is put forward to demonstrate that a constitutional violation may occur." Id. at 336.

For example, in Red Bank, 367 N.J. Super. at 482, the Board of Education argued that the Commissioner erred in granting the charter renewal and expansion without adequately considering the detrimental impact on its ability to provide a thorough and efficient education. The Board alleged that the charter school would cause the District's budget to be reduced by $720,000, requiring the elimination of four teaching positions, resulting in bigger classes, the elimination of courtesy busing, and the reduction of hall monitors, instructional assistants, and cafeteria monitors. Ibid. Even in that case, we affirmed the Commissioner's decision because "[t]he paucity of specificity in the Board's charges is fatal." Id. at 483. Because of the clear expression of the legislative will supporting charter schools, the proofs must be "reliable." Englewood, 164 N.J. at 336.

In the cases before us, the District does not join in ELC's appeal. It does not object to the expansions on the basis of budgetary or other detrimental effect.

ELC did not make any showing, much less a preliminary showing, on which the Commissioner could rely as to the effect the expansions would have on the District's budget. Id. at 334. Furthermore, although the Commissioner can consider unsolicited comments from local citizens, Quest Acad., 216 N.J. at 389, there is no statutory or case law requiring the Commissioner to evaluate

34

the potential impact of funding on the District when that assertion is made by another entity, and not the District itself. In fact, there are sound reasons for limiting such challenges, notably, that it is the affected district that can best gauge the impact of charter school funding on its own budget.

In any event, ELC did not specifically demonstrate how the District students would be deprived of a thorough and efficient education by the expansion. ELC represented that the District's budget crisis was caused by both the chronic underfunding of the SFRA formula and the rapid expansion of charter schools in Newark. See Abbott XXI, 206 N.J. at 359 ("The State made a conscious and calculated decision to underfund the SFRA formula when enacting the FY 2011 Appropriations Act."). ELC was required to separate the two sources it claimed contributed to the budget crisis and failed to do so.

ELC maintains that the District had to implement cost reductions, including employee layoffs. It does not, however, account for the fact that the District has to pay the charter schools only 90% of certain student funding categories, and retains 10%—an amount designed to respond to concerns about the loss of funding. Englewood, 164 N.J. at 333; N.J.S.A. 18:36A-12(b). On paper, the reduced per pupil allocation should ease the budgetary pressures—not worsen them.

ELC does not account for the fact that the legislative formula is designed to maintain school funding at the constitutionally required level despite the existence of charter schools. Nor does ELC address the fact that in 2011 at least, 205 districts out of New Jersey's 560 school districts, in addition to Newark, were similarly underfunded. Abbott XXI, 206 N.J. at 458.

Further, under the SFRA, the District's Adequacy Budget is weighted to reflect the number of special education and LEP students. As a result, should the District educate more special needs students, it will be entitled to additional funding. The District's budget is reduced by charter school expansion. But it is educating significantly fewer students. It is simply not clear whether the reductions in available funds is attributable to reduced enrollment.

In support of its argument that the Commissioner has a heightened obligation to scrutinize and evaluate appropriate funding in Abbott school districts, ELC cites to Englewood. That case, however, was decided eight years before the SFRA was enacted. Even in Englewood, the Court held that "the Commissioner is entitled to rely on the district of residence to come forward with a preliminary showing that the requirements of a thorough and efficient education cannot be met." Englewood, 164 N.J. at 334.

The Court in <u>Englewood</u> cited to two key provisions of the Act: one that granted the District the authority to challenge a charter school applicant's submission, and the other, the funding provision, which then imposed a "presumptive amount equal to 90%" on the District, <u>L.</u> 1995, <u>c.</u> 426, § 12 (subsequently amended). <u>Ibid.</u> As a result, when "[r]ead in combination, those statutory provisions require a district of residence to make an initial showing that imposition of the presumptive amount, or a proposed different amount for the charter school applicant's pupils would impede, or prevent, the delivery of a thorough and efficient education in that district." <u>Ibid.</u> However, the Court noted that the "application of this standard in the context of an [<u>Abbott</u>] district is not part of this case. We leave that question for another day." <u>Ibid.</u>

ELC contends the day has arrived, and that the State, not the District, should bear the burden of proving the District can provide a thorough and efficient education to its public schools even if the charter schools applications are approved. In the nineteen years since <u>Englewood</u> was decided, the Court has reaffirmed the holding without addressing the <u>Abbott</u> school issue. <u>Quest Acad.</u>, 216 N.J. at 377-78. We have as well in former <u>Abbott</u> school districts. <u>See</u> <u>Bd. of Educ. of Hoboken v. N.J. State Dep't of Educ.</u>, No. A-3690-14 (App. Div. June 29, 2017) (slip op. at 20).

Most significantly, the funding provision of the Act, intended to buffer public school students while allowing for the growth and maintenance of charter schools, was amended after Englewood. The Commissioner no longer has merely the discretion to reduce funding rates for charter school children; the Commissioner must implement the SFRA formula. N.J.S.A. 18A:36A-12(b).

ELC has not demonstrated the reason, given the SFRA formula, that a different standard should today be applied to former Abbott districts. See J.D. ex rel. Scipio-Derrick v. Davy, 415 N.J. Super. 375, 378 n.1 (App. Div. 2010) ("Under the SFRA, former Abbott districts no longer receive supplemental and parity aid."). Therefore, the Commissioner was not required to evaluate the impact of the potential loss of funding allocated to charter schools over time because of the District's former classification as an Abbott district, and current status as an SDA district, in the absence of objection by the District. Districts should continue to bear the burden to demonstrate that charter school funding will prevent delivery of a thorough and efficient education, even in former Abbott districts.

## VII.

Segregation is strictly prohibited in our schools, and is specifically prohibited in charter schools. See N.J.S.A. 18A:36A-7. This ban includes not

just race or ethnicity, but discrimination against those with different intellectual or athletic abilities, or proficiency in the English language. The law further provides that although a charter school can establish reasonable criteria to evaluate prospective students, the criteria must be included in the school's charter and is subject to review by the Commissioner when the charter school obtains initial approval.

The Supreme Court has found that the "form and structure" of the appropriate analysis when determining segregative effect is within the discretion of the Commissioner and the State BOE. Englewood, 164 N.J. at 329. However, to advance the obligation on charter schools, the DOE has adopted regulations requiring the Commissioner, prior to approval of a charter and on an annual basis thereafter, to "assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence." N.J.A.C. 6A:11-2.1(j); N.J.A.C. 6A:11-2.2(c); 32 N.J.R. 3560(a), 3561 (Oct. 2, 2000).

ELC does not suggest that any of the respondents' enrollment policies are other than color blind, random, or keep the schools from being "open to all students in the community[.]" See Red Bank, 367 N.J. Super. at 478. Similarly, there is no suggestion that post-enrollment practices deliberately have a segregative effect. ELC's argument is that the prospective increase in

39 A-3416-15T1

numbers will result in de facto segregation, which the Commissioner must discourage.

However, the respondents admit students based on a random blind lottery. Furthermore, four respondents participate in a universal enrollment system that employs algorithms that include, and weigh in an advantageous manner, the applicants who are eligible for free lunch, have IEPs, and those who otherwise have higher needs. All the schools are party to a Compact designed to provide for all students in the District, including those in the highest at-risk populations. There is no indication that nefarious post-enrollment practices are engaged in by any of the charter schools.

That the demographics of the individual charter schools do not precisely reflect the overall demographics for the District is not sufficient to demonstrate a segregative effect. Red Bank, 367 N.J. Super. at 476-77. Thus, although the Commissioner did not specifically address the issue, ELC's submissions fail to substantiate a segregative effect, either in the pre- or post-enrollment practices, such that the Commissioner's decisions can be characterized as arbitrary, capricious, and unreasonable.

ELC contends that the Commissioner's decisions were arbitrary, capricious, and unreasonable because he did not address its submissions or provide a reasoned analysis for the approvals.

There is no statutory or regulatory requirement that the Commissioner include reasons for granting, as opposed to denying, an application to renew or amend. Indeed, the only requirement found in the regulations is, with regard to initial charter school applications and applications for renewal, that "[t]he notification to eligible applicants not approved as charter schools[,]" or "not granted a renewal shall include reasons for the denial[s]." N.J.A.C. 6A:11-2.1(f); N.J.A.C. 6A:11-2.3(d) (emphasis added). Relevant precedent does require the reasons for the Commissioner's decision to be discernible from the record. Red Bank, 367 N.J. Super. at 476.

Here, each of the charter schools were high performing schools (six were Tier 1), and all of the schools were in great demand with long wait lists. All of the schools' performance data, a significant factor in assessing a request to amend a charter, was higher than the District or State average, as represented by students' PARCC scores. Further, all of the schools, which had for years been submitting detailed annual reports, were organizationally sound and fiscally viable.

The record also shows that there is a need for an increase in charter school enrollment in Newark, as the District acknowledged in recommending full approval of two applications, the partial approval of one application, and the denial, with an alternative partial approval recommendation for three applications. Thus, the Commissioner's decision was sufficient as to each respondent and is supported by the record.

IX.

ELC also contends in its second point that the Commissioner authorized the creation of new charter school facilities on incomplete information and in unidentified locations. The District did not object to proposed enrollment expansions by University Heights, Great Oaks, Robert Treat, North Star, and TEAM.

We are not bound by an agency's interpretation of a statute, applying de novo review. US Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012). In doing so, we "defer to an agency's interpretation of . . . [a] regulation, within the sphere of [its] authority, unless the interpretation is 'plainly unreasonable.'" Ibid. (alterations in original) (quoting In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010)). "This deference comes from the understanding that a state agency brings experience and specialized

knowledge to its task of administering and regulating a legislative enactment within its field of expertise." In re Election Law, 201 N.J. at 262.

The Act requires that a school's application for a charter must include, "[a] description of, and address for, the physical facility in which the charter school will be located[.]" N.J.S.A. 18A:36A-5(j). A "satellite campus" is defined as "a school facility operated by a charter school that is in addition to the facility identified in the charter school application or charter, if subsequently amended." N.J.A.C. 6A:11-1.2. "A charter school may operate more than one satellite campus in its district or region of residence, subject to charter amendment approval, pursuant to N.J.A.C. 6A:11-2.6." N.J.A.C. 6A:11-4.15(b). To that end, N.J.A.C. 6A:11-2.6(a)(1)(i) and (iv) provide that in addition to seeking an increase in enrollment, a charter school may also seek an amendment to open a new satellite campus.

In Education Law Center ex rel. Burke v. N.J. State Board of Education, 438 N.J. Super. 108, 111 (App. Div. 2014), the ELC challenged the Board's adoption of the amended regulations N.J.A.C. 6A:11-2.6(a)(1)(iv) and N.J.A.C. 6A:11-1.2, permitting existing, successful charter schools to open satellite campuses. We concluded that the Board did not exceed its statutory authority in adopting the amended regulations and affirmed. Id. at 112.

43

In <u>Burke</u>, ELC unsuccessfully argued that the Act required the DOE to conduct "a full initial review before a satellite location can be approved." <u>Id.</u> at 121. We concluded that "the addition of a satellite campus is more like the expansion of grade and enrollment levels than the opening of an entirely new charter school." <u>Ibid.</u> <u>Burke</u> explains that

> [i]n the case of an existing charter school that seeks to expand into additional physical space, it makes little sense to require a whole new application and the resulting review process. While a satellite campus is not the same as expanding into additional physical space immediately adjacent to the existing facility, the satellite campus would still be part of the same school. A school is more than a building. It is an educational program, and the teaching, administrative, and operational staff that devises and runs the program. Site unity is an appropriate consideration in evaluating the potential success or problems of a proposed charter school, but a remote site does not make a wholly different school.
>
> [<u>Id.</u> at 120.]

Further, ELC's argument that the Commissioner and the DOE could "not adequately evaluate satellite campuses for the physical safety and suitability of the site for educational use[,]" was rejected. <u>Id.</u> at 122. In proposing the amendments to the regulations the DOE indicated, in response to comment five, that the "[f]acilities identified by an amendment request for a satellite campus are subject to the same review and approval procedures as for new charter school facilities[,]" pursuant to the proposed amendment at N.J.A.C.

A-3416-15T1

6A:11-2.1(i).  Ibid. (quoting 44 N.J.R. 26(a), 27 (Jan. 7, 2013)).  We found that it

> must assume the Commissioner will require an adequate evaluation of a proposed satellite campus site and reject any charter amendment that fails to meet appropriate standards for a school building.  If a proposed campus presents safety concerns or is otherwise unsuitable for the educational needs of children[,] . . . interested parties should raise specific objections to the proposed amended charter.
>
> [Ibid.]

Approval of increases in enrollment is a necessary precursor to the addition of satellite campuses or any investment in additional structures.  It is reasonable for the Commissioner to have approved expansion before a charter school could be expected to go through the arduous process of identifying and securing a site.

Additionally, prior to the opening of the satellite campus, the school must submit to the DOE a description and address of the physical facility, N.J.S.A. 18A:36A-5(j), and the lease, mortgage or title to the facility, a certificate of occupancy for educational use, a sanitary inspection report with a satisfactory rating, and a fire inspection certificate with an "Ae" (education) code life hazard.  N.J.A.C. 6A:11-2.1(i)(6)-(9).  Moreover, a charter school must obtain the Commissioner's approval before locating at a site other than the one identified in the charter.

It is also possible that the Commissioner, who has specialized expertise in this area, understood that the process of obtaining a satellite campus was much less involved than obtaining the original site for the school. The Commissioner's interpretation of the regulation, which allowed for the approval first of the expansion and only then for the approval of the satellite campus, was therefore "not plainly unreasonable." Once having obtained approval for their expansions, the affected respondents were then in a position to secure approvals for any proposed satellite locations. Nothing in this record suggests approval would be improvidently granted.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3416-15T1