**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3342-16T1

IN THE MATTER OF GRANT
OF THE CHARTER RENEWAL
OF THE RED BANK CHARTER
SCHOOL.

_____

Argued September 9, 2019 – Decided September 20, 2019

Before Judges Sabatino, Sumners and Geiger.

On appeal from the New Jersey Department of Education.

Michael Ross Noveck argued the cause for appellants Fair Schools Red Bank and the Latino Coalition (Gibbons PC and ACLU New Jersey Foundation, attorneys; Lawrence S. Lustberg, Avram D. Frey, Jessica L. Hunter, Jeanne M. LoCicero, and Michael Ross Noveck, on the briefs).

Thomas Owen Johnston argued the cause for respondent Red Bank Charter School (Johnston Law Firm, LLC, attorneys; Thomas Owen Johnston, of counsel and on the briefs).

Geoffrey Nelson Stark, Deputy Attorney General, argued the cause for respondent Commissioner of Education (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney

General, of counsel; James M. Esposito, Jr., Deputy Attorney General, on the briefs).

PER CURIAM

This appeal concerns the enrollment practices of a charter school located in a community of predominantly Latino population. The school, Red Bank Charter School ("RBCS"), historically has had a mainly white enrollment, until very recently when the percentage of white and Latino students became roughly equal. The racial and ethnic mix of RBCS has been the subject of public controversy for several decades, as exemplified by our 2004 opinion describing an earlier phase of that controversy and remanding the matter for an administrative hearing. See In re Red Bank Charter Sch., 367 N.J. Super. 462, 467 (App. Div. 2004) ("Red Bank Charter").

In the present litigation, two nonprofit advocacy organizations in Red Bank appeal certain aspects of a final agency decision of the New Jersey Department of Education ("DOE") granting the renewal of RBCS's charter and written amplifications of that decision by two successive DOE Commissioners. Appellants contend the Commissioners' decisions are inadequate because they fail to make explicit findings addressing appellants' claims of discriminatory enrollment practices at RBCS. According to appellants, those practices have suppressed Latino student enrollment at RBCS and perpetrated white enrollment

at a level far higher than the white school population in the local public school district. Appellants further argue the Commissioners acted arbitrarily and capriciously by not halting RBCS's admission policies that give preference to applicants who have siblings already enrolled at the school. Appellants also contend the Commissioners' rulings are deficient in not addressing alleged shortcomings of RBCS's advertising and outreach efforts in encouraging Latino parents to apply for admission, and so-called "whisper campaigns" to encourage white families to apply.

In their opposition, RBCS and the Commissioner argue appellants lack standing to pursue this appeal and, moreover, their claims of discrimination lack merit. They maintain the law does not provide organizations such as appellants with a right to litigate their grievances in the context of an appeal from a charter school renewal, especially since the public school district in this case has not exercised its statutory right to bring or take part in this appeal. Respondents further deny there is any proven discrimination in RBCS's enrollment practices, and emphasize the Commissioner's amplifications provide ample assurance the DOE is continuing to monitor the demographic mix of admitted students at RBCS and will take any remedial measures that may be needed before the school's present five-year charter expires.

A-3342-16T1

For the reasons that follow, we conclude appellants possess standing to litigate the important constitutional and statutory issues of alleged discrimination they have raised in this appeal. On the merits, we affirm the agency's rejection of appellants' request to suspend the sibling preference policy, a practice the DOE is closely monitoring. However, we are persuaded the matter must be remanded to the DOE to enable the present Commissioner to provide further amplification of his ruling and explicitly address, based strictly on the existing administrative record, the omitted subjects identified by appellants.

We decline to order the Commissioner at this time to refer disputed issues for an evidentiary hearing in the Office of Administrative Law ("OAL"), or to require the Commissioner to expand the existing factual record. We do so without prejudice to the right of appellants or any other party to pursue the grievance process set forth in N.J.S.A. 18A:36A-15, and potential factual development in connection with such a grievance. Furthermore, our opinion does not foreclose appellants from raising their concerns about discriminatory enrollment practices or impacts during RBCS's next charter renewal process, which is scheduled to begin in the fall of 2021.

A-3342-16T1

# I.

To place the facts and the parties' arguments in context, we begin with some background concerning our State's charter school laws and regulations, and pertinent anti-segregation principles.

## A. The Charter School Program Act of 1995

In 1995, the Legislature enacted the Charter School Program Act of 1995 ("CSPA"), N.J.S.A. 18A:36A-1 to -18. As part of that initiative, the Legislature declared that "the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom." N.J.S.A. 18A:36A-2. The Legislature further determined that "the establishment of a charter school program is in the best interests of the students of this State and it is therefore the public policy of the State to encourage and facilitate the development of charter schools." Ibid.

A charter school is "a public school operated under a charter granted by the [C]ommissioner." N.J.S.A. 18A:36A-3(a). It "is operated independently of a local board of education and is managed by a board of trustees," who are

"deemed to be public agents authorized by the State Board of Education to supervise and control the charter school."  Ibid.

A charter school must operate in accordance with its charter and the laws and regulations governing public schools, unless the school requests and is given an exception by the Commissioner.  N.J.S.A. 18A:36A-11(a).  As we will discuss in Part III of this opinion, "[a]ny individual or group may bring a complaint to the board of trustees of a charter school alleging a violation of the provisions of this act."  N.J.S.A. 18A:36A-15.

With respect to admissions, charter schools are "open to all students on a space available basis."  N.J.S.A. 18A:36A-7.  A charter school cannot discriminate in its admissions policies and practices, although it "may limit admission to a particular grade level or to areas of concentration of the school, such as mathematics, science, or the arts."  N.J.S.A. 18A:36A-7.

Particularly relevant to the present case is N.J.S.A. 18A:36A-8, which provides:

> a. Preference for enrollment in a charter school shall be given to students who reside in the school district in which the charter school is located. If there are more applications to enroll in the charter school than there are spaces available, the charter school shall select students to attend using a random selection process. A charter school shall not charge tuition to students who reside in the district.

b. A charter school <u>shall allow any student who was enrolled in the school in the immediately preceding school year to enroll</u> in the charter school in the appropriate grade unless the appropriate grade is not offered at the charter school.

c. A charter school <u>may give enrollment priority to a sibling of a student enrolled in the charter school</u>.

d. If available space permits, a charter school may enroll non-resident students. The terms and condition of the enrollment shall be outlined in the school's charter and approved by the commissioner.

e. The admission policy of the charter school shall, <u>to the maximum extent practicable, seek the enrollment of a cross[-]section of the community's school age population including racial and academic factors</u>.

[(Emphasis added).]

After approving a charter application, the Commissioner must annually assess whether the school is meeting the goals of its charter. N.J.S.A. 18A:36A-16(a). Regulations specify the Commissioner must also annually assess "the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence." N.J.A.C. 6A:11-2.2(c). To facilitate that review, charter schools must submit an annual report to the Commissioner, local board of education, and the county superintendent of schools. N.J.S.A. 18A:36A-16(b); N.J.A.C. 6A:11-2.2. The Commissioner may revoke a charter at any time if the school has not fulfilled or has violated any of

A-3342-16T1

the conditions of its charter.  N.J.S.A. 18A:36A-17.

## B. Constitutional Anti-Segregation Principles

It is well-established that, "[r]ooted in our Constitution, New Jersey's public policy prohibits segregation in our public schools."  In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 164 N.J. 316, 324 (2000).  See also id. at 330 ("[S]egregation, however caused, must be addressed."); In re Renewal Application of Team Acad. Charter Sch., 459 N.J. Super. 111, 144 (App. Div. 2019) ("Segregation is strictly prohibited in our schools, and is specifically prohibited in charter schools.").  In that regard, the CSPA provides that "[t]he admission policy of the charter school shall, to the maximum extent practicable, seek the enrollment of a cross[-]section of the community's school age population including racial and academic factors." N.J.S.A. 18A:36A-8(e) (emphasis added).  See also N.J.A.C. 6A:11-4.5(e) (same).

Our Supreme Court has found that the "form and structure" of the segregative analysis under the CSPA is within the discretion of the DOE Commissioner and the State Board of Education to determine.  Englewood, 164 N.J. at 329.  See also Team Academy, 459 N.J. Super. at 145 (recognizing the Commissioner's and State Board of Education's discretion when determining

segregative effect).

C. The Oversight Role of the DOE and the Commissioner

Within this regulatory structure, the Supreme Court has recognized the Commissioner's obligation under the New Jersey State Constitution "to prevent segregation in our public schools . . . when [he or she] performs his [or her] statutory responsibilities under the Charter School Act." Id. at 328. Indeed, as far back as 1971 the Commissioner "recognized that . . . there is an 'obligation to take affirmative steps to eliminate racial imbalance, regardless of its causes,'" citing to New Jersey's "constitutional provisions for a thorough and efficient school system (N.J. Const. art. VIII, § 4, ¶ 1), and against segregation in the schools (N.J. Const. art. I, ¶ 5)." Jenkins v. Twp. of Morris Sch. Dist., 58 N.J. 483, 506 (1971). This state constitutional duty applies equally in the charter school context. See, e.g., Englewood, 164 N.J. at 328 ("The constitutional command to prevent segregation in our public schools superimposes obligations on the Commissioner when he performs his statutory responsibilities under the Charter School Act.").

To conform with these constitutional and statutory commands, "the Commissioner must use the full panoply of his powers to avoid [segregation]." Id. at 329. See also Booker v. Bd. of Educ. of City of Plainfield, 45 N.J. 161,

178-79 (1965) (recognizing Commissioner's power extends beyond addressing segregated schools and includes remedial action to alleviate substantial racial imbalance); In re Petition for Authorization to Conduct a Referendum on the Withdrawal of North Haledon Sch. Dist. from Passaic Cty. Manchester Reg'l High Sch., 363 N.J. Super. 130, 139 (App. Div. 2003) (discussing Supreme Court decisions requiring "education policy makers to anticipate imbalance and to take action to blunt perceived demographic trends which will lead to racial or ethnic imbalance."). Just as the Commissioner is obligated to act if a charter school "systematically" recruits pupils of a particular race or national origin, the Commissioner must also "be prepared to act if the de facto effect of a charter school were to affect a racial balance precariously maintained in a charter school's district of residence." Englewood, 164 N.J. at 328.

In response to the Court's decision in Englewood, and to the companion case, In re Greater Brunswick Charter Sch., 164 N.J. 314, 315 (2000), regulations were adopted that required the Commissioner, approving a charter, N.J.A.C. 6A:11-2.1(j), and on an annual basis thereafter, N.J.A.C. 6A:11-2.2(c), to "assess the student composition of a charter school and the segregative effect that the loss of the students may have on its district of residence. The assessment shall be based on the enrollment from the initial recruitment period pursuant to

N.J.A.C. 6A:11-4.4(b)."  32 N.J.R. 3560(a), 3561 (Oct. 2, 2000).  N.J.A.C. 6A:11-4.4(a) requires "a charter school [to] submit to the Commissioner the number of students by grade level, gender and race/ethnicity from each district selected for enrollment from its initial recruitment period for the following school year."

This court similarly recognized in the previous Red Bank Charter appeal the Commissioner's obligation under the State Constitution to prevent segregation in New Jersey's public schools.  See, e.g., 367 N.J. Super. at 471-72 (noting that "[a]ll parties agree that the Commissioner is required to monitor and remedy any segregative effect that a charter school has on the public school district in which the charter school operates," and "[t]he Commissioner must vigilantly seek to protect a district's racial/ethnic balance during the charter school's initial application, continued operation, and charter renewal application.").  See also Team Academy, 459 N.J. Super. at 145 (recognizing the Commissioner's obligation to annually monitor the possible segregative effective of a charter school upon the local school district).

II.

RBCS opened in 1998. It presently enrolls 200 students, from prekindergarten through eighth grade.[1] The school's charter limits enrollment to twenty students in each of the ten grades.

For many years, starting long before the present litigation, RBCS has been accused of enrolling a student population that does not reflect a cross-section of the Red Bank community. In 2001, the Red Bank Board of Education (the "School Board"), challenged a proposed expansion of RBCS's enrollment on the grounds that RBCS had allegedly "worsened the racial ethnic imbalance in the [Red Bank] district schools." Red Bank Charter, 367 N.J. Super. at 467. The School Board contended that RBCS was "siphoning" non-minority students from the district schools, which increased the "exodus of whites from the school district." Id. at 472. The School Board appealed the DOE's approval of the charter expansion request.

Based on the record in that earlier case, we remanded the dispute for an administrative hearing. Among other things, we directed the hearing to focus upon "whether some of [RBCS's] practices may be worsening the existing

---

[1] The prekindergarten class enrollment was originally capped at fifteen students, but counsel clarified at oral argument the class is now at twenty.

racial/ethnic imbalance in the district schools." Id. at 480. We did not specify the manner or venue of the remand hearing.

Several years after our 2004 remand, the Board and RBCS entered into a consent order on March 20, 2007 in the OAL ending the litigation, without any administrative hearing. RBCS's charter was renewed by the DOE in ensuing years in 2006 and 2012, apparently without litigation.[2]

The present appeal arises from the most recent renewal application submitted by RBCS to the DOE in September 2016. As part of its review of that application, the DOE conducted a site visit at RBCS in October 2016. Because DOE ranks RBCS as a "Tier 1" school, based on its students' high academic performance on standardized tests, the site visit was shortened to only several hours, instead of a full day. Among other favorable things, the DOE concluded from the site visit that RBCS is "faithful to its mission," that the school "promotes a culture of high expectations," and that the RBCS Board "has the capacity to govern the school effectively."

---

[2] An initial charter is for a term of four years and may be renewed for a five-year period. N.J.S.A. 18A:36A-17.

On February 28, 2017, Kimberly Harrington, who was then the DOE Commissioner, granted RBCS's charter renewal in a "short, congratulatory letter," for a period of five years through June 30, 2022.

A. The Present Appeal of RBCS's 2017 Charter Renewal

On April 11, 2017, the Latino Coalition of New Jersey and Fair Schools Red Bank (collectively "the Coalition")[3] appealed Commissioner Harrington's renewal decision to this court. The Coalition asserted the renewal decision violated: (1) the CSPA; (2) the Thorough and Efficient Education Clause of the New Jersey Constitution, N.J. Const. art. VIII § 4 ¶ 1; (3) and Article I, paragraph 5 of the New Jersey Constitution. The Coalition further argued the Commissioner's decision was arbitrary and capricious.

Pursuant to Rule 2:5-1(b), Commissioner Harrington filed with this court on August 9, 2017 an Amplification of Reasons for her February 28, 2017 decision, on her own initiative. The August 2017 Amplification cited three main

_____

[3] According to appellants, the Latino Coalition of New Jersey "is a [Section] 501(c)(14) corporation established in 2009, made up of organizations and individuals from Monmouth and Ocean County, New Jersey." Co-appellant Fair Schools Red Bank, meanwhile, "is an unincorporated organization of Red Bank residents." Appellants state they represent "the membership of Fair Schools Red Bank and the Latino Coalition, [which] includes residents of Red Bank with school-age children, some of whom attend Red Bank's [p]rimary and [m]iddle schools." At oral argument, appellants' counsel clarified they do not represent the interests of Latino children who are presently enrolled at RBCS.

14                                                              A-3342-16T1

reasons as support the renewal decision: (1) RBCS's favorable student performance on statewide assessments; (2) operational sustainability; and (3) demographic enrollment data and public comment.

With regard to the first listed factor of student performance, Commissioner Harrington noted that RBCS is a "Tier Rank 1" school, and had outperformed Red Bank district schools in English language arts and mathematics in 2014-2015 and 2015-2016. The Commissioner observed in this regard that "RBCS has a track record of student success based on the results of statewide assessments."

Regarding the second factor of operational sustainability, Commissioner Harrington noted that: (1) RBCS's charter already had been renewed three times before the 2017 renewal; (2) its enrollment the last term was at capacity, with a waiting list; and (3) leadership at RBCS has been "stable."

As to the third factor of demographics and pupil enrollment, Commissioner Harrington acknowledged that "[a] cursory review of the racial/ethnic composition of RBCS's overall student population . . . suggest[s] that it does not currently reflect the community's school-age population." (Emphasis added). However, the Commissioner explained that "a closer look

reveals the RBCS has taken sufficient action to address the issue and has obtained the necessary results." (Emphasis added).

Commissioner Harrington delineated several reasons to support her conclusion that RBCS had taken "sufficient action" to address its racial imbalance:

- There are limited opportunities for new students to enroll because RBCS has a maximum enrollment of 200 students, or 20 students per grade, and a low attrition rate;

- RBCS had bolstered its outreach for the 2015-2016 school year by mailing the RBCS application and advertisements to all Red Bank residents in both English and Spanish, and targeted high-needs communities with posters and banners;

- Prekindergarten enrollment data from 2015-2016 indicates that the recruitment strategy was effective, with 60% of the 2015-2016 incoming prekindergarten class identifying as Hispanic, as compared to 27% of the 2014-2015 incoming prekindergarten class identifying as Hispanic;

- In April 2016 RBCS implemented a weighted lottery[4] for economically disadvantaged students

---

[4] According to the Commissioner, pursuant to N.J.S.A. 18A:36A-7 and N.J.S.A. 18A:36A-8, charter schools may seek approval from the DOE to establish certain admission policies, including weighted lotteries, which favor economically disadvantaged students. Economically disadvantaged students who apply to RBCS have their names entered into the lottery three times, while all other students have their names entered only twice.

A-3342-16T1

"in order to better represent a cross-section of the community's school-age population;"

- Although the Commissioner considered ending RBCS's sibling preference policy (as the Coalition has advocated) in order to make more seats available to new students, the Commissioner determined it would be unnecessary, citing to the increase in enrollment of Latino prekindergarten students; and

- After comparing the ethnic makeup of the district schools and RBCS, it was determined that there was no compelling evidence to suggest that RBCS is having a segregative effect on the district schools.

Following the August 2017 Amplification, the Coalition filed an objection with this court, arguing the amplification was improperly based on evidence not in the record and had been submitted for the purpose of litigation advocacy.

B. Post-Remand & Subsequent DOE Proceedings

In a September 15, 2017 order from this court, we remanded the case to the Commissioner for further "proceedings," in order to provide the Coalition and DOE "with [an] adequate opportunity to supplement the record as it relates to the August 9, 2017 Amplification of Reasons."

The Coalition's November 2017 Submission to the Commissioner

Pursuant to the remand by this court, the Coalition submitted to Commissioner Harrington a detailed twenty-six-page letter on November 13,

17

2017, which set forth arguments and evidence of RBCS's alleged historical practice of segregation in its recruitment and enrollment practices. In the letter, the Coalition's members expressed "deep[] concern[] that … RBCS is increasing segregation in the [d]istrict schools."[5] The Coalition "submit[ed] [the] letter and attached materials to assist the Commissioner in identifying the problems posed by RBCS' operation, as well as specific remedies to address them."

In its November 2017 submission, the Coalition highlighted the following matters in support of its argument that the Commissioner must make policy changes to remedy the racial imbalance in RBCS:

- Census data showing the demographic shift and increase in Red Bank's Latino community over the past twenty years;

- Statements, letters, and newspaper articles indicating that RBCS had endeavored to position itself as the only public school option for white parents seeking refuge from the majority-Latino district schools. Or, as the Coalition puts it, RBCS was allegedly intending to mitigate against so-called "white flight" from Red Bank to nearby towns;

- RBCS has historically limited information about its application process and lottery system to affluent white social networks and parent groups. In other words, RBCS's recruiting was, in

---

[5] Notably, the district has not participated in this appeal.

essence, a "whisper campaign" amongst white middle- and upper-class RBCS parents to other white middle- and upper-middle class families;

- The sibling preference policy perpetuates RBCS's skewed racial demographic because most siblings are the same race and enrollment is already very limited. Indeed, the Commissioner noted in the August 2017 Amplification that, according to the "school lead," roughly half of the 20 prekindergarten seats go to siblings each year; and

- The weighted lottery is being undermined by RBCS's sibling preference policy and failure to recruit "a cross-section of the community.

Despite these criticisms, the Coalition clarified that it was not asking the Commissioner to deny RBCS's renewal application altogether, recognizing that the "closure of [RBCS] would disrupt and unfairly penalize its 200 students." However, the Coalition did urge that "corrective action is required if the RBCS charter is to be renewed," and insisted that the Commissioner address the "central causes of RBCS'[s] segregative effect . . . by requiring changes to RBCS policies."

(1) Proposed Remedial Measures

The Coalition proposed three specific remedial measures to the Commissioner.

First, the Coalition asked the Commissioner to evaluate standardized tests scores in a manner that accounts for biases along the lines of race, class, and English-language proficiency. The Coalition advocated the charter school's performance should only be compared to the district schools "after differentiating between students of racial, economically disadvantaged, and [limited English proficiency] groups." According to the Coalition, "[s]uch a policy change would remove the incentive for RBCS to recruit predominantly white, wealthy, English-proficient students . . . . [a]nd it would remove the harmful and unfair stigma that [,by comparison,] the [d]istrict is a poor academic institution."

Second, the Coalition urged the Commissioner to "meaningfully investigate and oversee the charter's marketing and recruitment efforts." The Coalition asserted that, "in light of the accounts of [the letters submitted by numerous] Red Bank parents [detailing the so-called alleged "whisper campaign"], the charter cannot be taken at its word that it is fulfilling its obligation to seek a cross-section of the community."

Third and finally, the Coalition requested the Commissioner suspend RBCS's sibling preference policy until the charter school's racial imbalance is corrected. The Coalition described as "illogical" the Commissioner's conclusion

in the amplification that ending the sibling preference policy "could be detrimental" to the enrollment of more Latino students.

(2) RBCS's Response Letter

In its administrative response to the Coalition, RBCS urged the Commissioner to: (1) reject the Coalition's letter submission as improper and contrary to the remand order because the submission presented new arguments and information that had not been raised before; (2) find that the Coalition lacked standing to bring an appeal of the charter renewal, and that the appeal was moot since the Coalition was not contesting the continuance of the charter; and (3) dismiss the Coalition's allegations of segregative impact, because "the available evidence clearly demonstrates that RBCS attracts a cross[-]section of the student age population in the Red Bank community." RBCS took issue with the Coalition's claim that RBCS was purposely not recruiting Latino students. In particular, RBCS asserted that recent "diverse enrollment trends" were a direct result of RBCS's positive outreach to the Latino community.

### Commissioner Repollet's April 2018 Amplification

In response to those submissions and this court's remand order, Commissioner Lamont Repollet[6] issued a four-page Amplification on April 16,

---

[6] Commissioner Repollet succeeded Commissioner Harrington in January 2018 after the change in gubernatorial administrations. He became Acting

2018 "reiterate[ing] the February 28, 2017 decision to renew RBCS's charter through June 30, 2022."  Commissioner Repollet did not refer the matter for an administrative hearing to delve into factual disagreements between the parties.

Commissioner Repollet's April 2018 Amplification concluded that, after considering the supplemental record, "it is evident . . . that RBCS is seeking, 'to the maximum extent practicable,' to enroll a cross-section of Red Bank Borough's school-age population."  The Commissioner, while acknowledging the letters of Red Bank residents suggesting what the Coalition alleged to be a "whisper recruitment campaign," nonetheless found RBCS's recruitment practices were sufficient during the relevant charter term (2013 to 2017), stating:

> RBCS recruited throughout the Red Bank Community by: providing the application in hard-copy and electronically in English/Spanish, direct mailings to Red Bank Borough residents, English/Spanish lawn signs through the community, posted and published advertisements for the application and latter in English/Spanish, a banner on the main Red Bank thoroughfare, and reaching out to local churches and community organizations to include information about RBCS in their bulletins and announcements.

Commissioner on January 29, 2018 and was sworn in as Commissioner on June 19, 2018, after he had issued the April 2018 Amplification. Dr. Lamont Repollet, DEPARTMENT OF EDUCATION, https://www.nj.gov/education/about/commissioner/repolletbio.shtml.

Commissioner Repollet endorsed RBCS's use of a weighted lottery as a tool to promote enrollment of economically disadvantaged students. The weighted lottery, which because effective at RBCS in 2017, "increases the odds a student identified as part of a specific educationally disadvantaged class . . . will gain a seat at RBCS." Thus, according to the Commissioner, "the ultimate purpose of the weighted lottery is to ensure that RBCS's enrollment represents a cross-section of the community's school-age population." Citing a certification from RBCS's principal included with RBCS's letter submission, the Commissioner noted that, in the first year of the weighted lottery, "the number of Hispanic students enrolled [per a] sibling preference increased 26 percent and the number of white students enrolled with a sibling preference decreased 11 percent."[7] Commissioner Repollet recognized that RBCS maintains a policy in which siblings of current RBCS students are automatically granted a seat in RBCS, and that, in the event the number of siblings applying for such seats exceeds the available seats, the sibling student is placed on a waitlist and granted enrollment through a lottery system. However, like Commissioner Harrington,

---

[7] Of the fifty-nine students admitted in 2016-2017, it is not clear how many of those students were in prekindergarten, and how many were older students who had been enrolled through sibling preference, but before the implementation of the weighted lottery.

Commissioner Repollet found no reason to discontinue the sibling preference policy, explaining that the weighted lottery will trend in a "direction that better reflects the demographics of school-aged population in the community . . . . [And] [i]t is anticipated that this trend will continue in coming years as [economically disadvantaged students], and siblings thereof, obtain seats at RBCS. (Emphasis added).

Although declining to take any immediate remedial action, Commissioner Repollet did caution in his decision that the DOE "will continue to monitor RBCS's demographics and will consider revisiting both the weighted lottery and sibling preference if the trend does not continue."

The Coalition thereafter expanded its appeal to include Commissioner Repollet's amplification.

III.

A.

Our governing standards of review are well established. In general, reviewing courts "need to respect agency action taken pursuant to authority delegated by the Legislature." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013) ("Quest Academy").

A-3342-16T1

Consequently, subject to the governing law, an "appellate court may [only] reverse an agency decision if it is arbitrary, capricious, or unreasonable." Ibid.

As we recently observed in Team Academy, our role in reviewing an agency action is generally restricted to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Team Academy, 459 N.J. Super. 139 (quoting Quest Academy, 216 N.J. at 385-86).]

This limited scope of review particularly applies to the context of a DOE Commissioner's decision on a charter-school renewal application because the Commissioner is "acting in his [or her] legislative capacity and not quasi-judicial capacity" when he or she is reviewing such an application. Red Bank Charter, 367 N.J. Super. at 475. As we stated in Red Bank Charter, "[t]he Commissioner is merely applying his [or her] education expertise to the collected data, including the documents, statistics, site visit, and comprehensive review, to determine whether the charter school should be renewed . . . . It

remains essentially an investigatory proceeding without the need of adversarial procedural trappings." Id. at 475-76.

Because the Commissioner is acting in a quasi-legislative, and not quasi-judicial capacity in this context, id. at 476, "he [or she] need not provide the kind of formalized findings and conclusions necessary in the traditional contested case." Ibid. (quoting In re Grant of Charter Sch. Application of Englewood on the Palisades Charter Sch., 320 N.J. Super. 174, 217 (App. Div. 1999)). That is because when reviewing "quasi-legislative decisions, [reviewing courts generally] do not seek to determine whether sufficient credible evidence is present in the record, but instead consider whether the decision is arbitrary, capricious or unreasonable." Ibid. The agency's "reasons for the decision need not be detailed or formalized, but must [at least] be discernible from the record." Ibid. (citing Bd. of Educ. of E. Windsor Reg'l Bd. of Educ. v. State Bd. of Educ., 172 N.J. Super. 547, 552-53 (App. Div. 1980)).

That said, the normal standard of appellate review for arbitrariness nonetheless "subsumes the need to find sufficient support in the record to sustain the decision reached by the [DOE] Commissioner." Quest Academy, 216 N.J. at 386. "[A] failure to consider all the evidence in a record would perforce lead to arbitrary decision making." Ibid. (citing Close v. Kordulak Bros., 44 N.J.

589, 599 (1965) (noting "the proofs as a whole" must be considered)).  In the same vein, a Commissioner's decision that is "based on a complete misperception of the facts submitted in a record would render the agency's conclusion unreasonable."  Id. at 387 (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588-89 (1988) (recognizing that an appellate court should intervene when agency's "finding is clearly a mistaken one")).

Lastly, we review de novo on appeal pure questions of law.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

B.

With these principles in mind, we turn to specific issues that have been presented to us.

### 1.  Appellants' Standing and Mootness Issues

RBCS and the Commissioner contend the Coalition lacks standing to pursue its claims on this appeal, and that consequently there is no need for this court to address the substance of those claims.  We disagree.

Respondents hinge their lack-of-standing argument largely upon N.J.S.A. 18A:36A-4(d), a provision within the CSPA stating that "A local board of education or a charter school applicant may appeal the decision of the [C]ommissioner [concerning a charter school application] to the Appellate

27

Division of the Superior Court." Respondents maintain this facet of the statute precludes any parties, other than a local public school district or a charter school applicant, from obtaining appellate review of a Commissioner's decision to grant, renew, or deny a charter, or the terms of such grants.

As we have noted, the Red Bank Public School District, which filed opposition to RBCS's renewal administratively with the DOE,[8] did not pursue that opposition to the next level through an appeal to this court. Because no such appeal was filed by the school district, respondents urge that we refuse to consider the Coalition's own prayers for relief.

In a related procedural argument not joined by the Commissioner, RBCS further contends we should dismiss the appeal because the Coalition is not seeking to terminate or suspend RBCS's charter, but instead challenges certain aspects of the charter's terms of renewal. Hence, according to RBCS, "there is no controversy about the continuing status of RBCS's charter."

"Standing 'refers to [a litigant's] ability or entitlement to maintain an action before the court.'" In re Adoption of Baby T, 160 N.J. 332, 340 (1999) (quoting N.J. Citizen Action v. Riveria Motel Corp., 296 N.J. Super. 402, 409

---

[8] We have not been supplied on appeal with a copy of the District's opposition submitted to the DOE, but that document is listed in the Statement of Items Comprising the Record.

(App. Div. 1997)). Under this state's general principles of standing, a party "must present a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision." In re Camden Cty., 170 N.J. 439, 449 (2002). See also In re Grant of Charter to Merit Preparatory Charter Sch. of Newark, 435 N.J. Super. 273, 279 (App. Div. 2014) (similarly applying these standing factors in a charter school case).

Our courts in this State generally take "a liberal approach to standing to seek review of administrative actions." In re Camden Cty., 170 N.J. at 448. "[W]hen an issue involves a 'great public interest, any slight additional private interest will be sufficient to afford standing.'" Merit Charter, 435 N.J. Super. at 279 (quoting Salorio v. Glaser, 82 N.J. 482, 491 (1980)). "[I]t takes but slight private interest, added to and harmonizing with the public interest[,] to support standing to sue." People for Open Gov't v. Roberts, 397 N.J. Super. 502, 510 (App. Div. 2008) (quotation omitted).

This court very recently considered these standing principles in Team Academy. In doing so, we declined to construe N.J.S.A. 18A:36-4(d) as an immutable barrier for public interest organizations to seek appellate review of a Commissioner's decisions concerning charter schools.

Specifically, in Team Academy we recognized that the petitioner, a nonprofit law center litigating on behalf of Abbott[9] schoolchildren, had standing to challenge the Commissioner's decision to approve the expansion of several Newark charter schools. Id. at 125-26. See also In re Ass'n of Trial Lawyers of Am., 228 N.J. Super. 180, 185 (App. Div. 1988) ("The standing of nonprofit associations to litigate in varying contexts has historically been upheld in New Jersey."). As we explained in Team Academy, "[n]onprofit organizations have representative standing to pursue claims on behalf of their members that are of 'common interest' and could not more appropriately be pursued by individual members." Team Academy, 459 N.J. Super. at 125-26 (citing Crescent Park Tenants Ass'n, 58 N.J. 98, 109 (1971)).

As we reasoned in Team Academy:

> Given our State's goal of providing a thorough and efficient education to all public school students, [the nonprofit law center's] standing seems clear. That the statute [N.J.S.A. 18A:36-4(d)] does not explicitly allow for organizations such as [the nonprofit law center] to appeal the Commissioner's decisions is inconsequential. The unfortunate reality is that, despite systemic improvements, public school children in Abbott districts continue to need representation in order to ensure their constitutional right to a thorough and efficient education is enforced. At no time has the overall statutory scheme regarding education expressly

---

9 Abbott v. Burke, 119 N.J. 287 (1990).

granted standing to entities such as [the nonprofit law center], yet [the center] has over many years successfully litigated on behalf of New Jersey's school children. To coin a phrase, if not [the nonprofit law center], then who?

The issues raised in this appeal, notably the effect of a substantial increase in charter school enrollment on traditional schools in a former Abbott school district, are of "great public interest[.]" Merit Preparatory, 435 N.J. Super. at 279 (quoting Salorio, 82 N.J. at 491). Thus, even if [the nonprofit law center] had demonstrated only a "slight additional private interest," it has standing.

[Id. at 126-127 (emphasis added).]

In supplemental briefs filed in this case at our invitation, both RBCS and the Commissioner attempt to distinguish the situation in Team Academy from the present matter. They contend the Coalition fundamentally differs from the appellant in Team Academy – the Education Law Center – because its two constituent organizations lack a sufficient school-centered mission. Among other things, respondents point out to us that the Latino Coalition is immersed in a variety of community and cultural activities that do not directly concern public education. Meanwhile, Fair Schools Red Bank is characterized by RBCS as an organization whose overall mission is to have RBCS's charter revoked and the school eliminated, although that particular relief is not sought on this appeal. Respondents further attempt to distinguish Team Academy because the public

31

schools in the City of Newark are State-operated, and therefore the voice of a local public school board was absent from the litigation.

We are satisfied the Coalition has standing to pursue the present appeal. The Coalition's members have a sufficient stake in the terms of the charter school's renewal, and the ongoing impact of the terms of that renewal and the school's enrollment practices on school-aged children who live in Red Bank, particularly Latino children. As described by the Coalition, it is advocating in this case the interests of "public school students and their families who are harmed by the Commissioner's decision, which has [allegedly] allowed the perpetration and exacerbation of segregation in Red Bank schools." That is an appropriate – indeed, more than "slight" – interest to advocate in a charter school renewal context, and one closely tied to the CSPA. People for Open Gov't, 397 N.J. Super. at 510 (noting the standard of a "slight" private interest, coupled with the public interest). The Coalition has real adverseness to the positions of respondents. It has articulated constitutionally-based and statutorily-based potential harms that could ensue if the Commissioner's decision is not altered.

We recognize that the Coalition does not have the long pedigree of the Education Law Center in litigating public school issues in New Jersey, and that the Coalition's activities are not exclusively focused on educational matters.

Even so, the Coalition, which is represented by co-counsel from the American Civil Liberties Union and a law firm's public interest fellowship, has more than ample credentials to advocate the serious issues of alleged segregation it has presented concerning this charter school's renewal.

In addition, the absence of the Red Bank Public School District from this appeal does not nullify the Coalition's standing. The District opposed RBCS's charter renewal before the DOE. There is no reason to believe the District's views concerning the issues before us on appeal diverge from those of the Coalition, except perhaps the District may favor more drastic remedies.

Further, we reject RBCS's contention the appeal is moot. An issue has become moot "when the decision sought in a matter, when rendered, can have no practical effect on the existing controversy." N.Y. Susquehanna & W. Ry. Corp. v. State Dep't of Treasury, Div. of Taxation, 6 N.J. Tax 575, 582 (Tax Ct. 1984) (citation omitted), aff'd, 204 N.J. Super. 630 (App. Div. 1985). The conditions of RBCS's renewal – particularly those concerning the continued sibling preference policy, the effectiveness of the weighted lottery and the school's outreach to the Latino population, and the other discrete issues posed on appeal – remain viable and unresolved concerns. The Commissioners themselves have stated in their amplifications that the DOE would be continuing

to monitor these concerns. The controversy is plainly not moot, and indeed persists.

2. Sibling Preference and the Newly-Instituted Weighted Lottery

A main remedial objective of the Coalition, asserted both at the agency level and again on this appeal, is to have the Commissioner suspend RBCS's sibling preference policy in the admissions process. The Coalition argues the sibling preference policy historically has been a significant factor in causing a much higher percentage of white students to be enrolled at RBCS, as compared with the local school-age population. In simple terms, the Coalition argues the sibling preference policy enables applicants who are younger siblings of white students who are already enrolled at RBCS to occupy seats that might be more demographically diverse if they were made open to all applicants, including Latino children.

Sibling preference is statutorily permitted. N.J.S.A. 18A:36A-8(c) ("A charter school may give enrollment priority to a sibling of a student enrolled in the charter school."). However, as this court cautioned in the prior appeal involving RBCS, "the statutory sibling preference is not mandatory and in particular circumstances, might not be appropriate, especially if its operation

A-3342-16T1

exacerbates existing racial/ethnic imbalance." Red Bank Charter, 367 N.J. Super. at 481-82.

As respondents have rightly pointed out, sibling preference admission policies have numerous benefits. Among other things, parents with more than one child at the school can be relieved of the logistical burdens of having their children transported to different school locations. The siblings potentially may benefit academically by having another sibling at the charter school who has been taught the same or similar curriculum, by perhaps the same teachers. The siblings may also benefit socially by having the opportunity to interact with friends of their siblings' own friends and classmates. The siblings might also participate together in extracurricular or recreational activities.

These benefits can be offset, however, if a sibling preference policy is materially thwarting efforts to achieve a racial/ethnic enrollment balance that is more representative of the local school-age population. As we have already noted, there was a sharp increase in the under-eighteen Latino population in Red Bank between 2000 and 2010. During that decade, the Latino under-eighteen population grew from 542 to 1,307, or 141.1%. Consistent with that pattern, the Latino enrollment at the Red Bank public school has grown from 18.9% in 1998 to 89.3% in 2017. Meanwhile, the Latino enrollment at RBCS has risen at a

35

comparatively slower pace, from 5.1% in 1998 to 45.2% in 2017. As we have already noted, the 2017 data indicates the percentages of whites (44.92%) and Latinos (45.2%) attending RBCS are roughly equal, as compared with, say, 2000 when white enrollment was 51.3%, about five times the Latino enrollment of 10.0%.

The key causal question on this issue is to what extent the school's sibling preference policy is unduly impeding further Latino enrollment and diversification at RBCS. Both Commissioner Harrington and her successor Commissioner Repollet considered that precise question, and concluded that the sibling preference policy should not be suspended at this time.

As Commissioner Harrington noted in her amplification, "RBCS's most recent data does not evidence that ending sibling preference would bring about the desired change." She recognized in this regard that in April 2016, RBCS, with the approval of the DOE, became the second charter school in this State to implement a weighted lottery that favors economically disadvantaged students, which would include many students from the Latino community. Through that weighted lottery, economically disadvantaged students enjoy a 3:2 preference in

A-3342-16T1

competing for any open slots at RBCS, including situations where multiple applicants have an older sibling at the school.[10]

As Commissioner Harrington underscored, the percentage of Latino children in the incoming prekindergarten class at RBCS increased from 27% in 2014-15 to 60% in 2015-16. Given this sharp increase, Commissioner Harrington found that, even with the policy of sibling preference continued, "the most recently admitted cohort of students is beginning to mirror the racial/ethnic composition of the community's school-age population." In light of this, Commission Harrington specifically "determined that it was unnecessary, and indeed, could be detrimental, to end sibling preference." That said, Commissioner Harrington committed in her August 2017 amplification that the DOE "will continue to monitor the demographic of the prekindergarten class and will consider revisiting the sibling preference issue if the trend does not continue."

Commissioner Repollet adopted and reinforced these conclusions in his own amplification in April 2018. Among other things, he noted that in the first year of implementation of the weighted lottery, the number of Hispanic students

---

[10] The record indicates the waiting list for admission at RBCS is substantial. For the 2013-14 school year, it was 143 students.

enrolled with a sibling preference increased twenty-six percent and the number of white students enrolled with sibling preference decreased eleven percent. This newer data suggested to Commissioner Repollet that "as a result of the weighted lottery in favor of economically disadvantaged students, enrollment at RBCS is <u>trending</u> in a direction that better reflects the demographics of the school-age population in the community." (Emphasis added). Commissioner Repollet also found that "[i]t is anticipated that <u>this trend will continue in coming years</u> as students with documented economically disadvantaged statuses, and siblings thereof, obtain seats at RBCS." (Emphasis added). Like his predecessor, Commissioner Repollet committed that the DOE "will <u>continue to monitor</u> RBCS's demographics and will <u>consider revisiting</u> both the weighted lottery and the sibling preference <u>if the trend does not continue</u>." (Emphasis added).

The record furnished to us on this appeal does not demonstrate that either Commissioner acted arbitrarily or capriciously, or violated constitutional norms, by declining to halt sibling preference at the school. Indeed, the actual annual impact of sibling preference on the enrollment numbers appears to be slight.

The record reflects that only about twenty of the 200 enrollment slots at the school open up each year, through the graduation of the eighth grade class

A-3342-16T1

and miscellaneous departures. The prekindergarten class – whether it be fifteen or twenty – is realistically the only class level that can significantly affect enrollment percentages, since no one is advocating that presently-enrolled RBCS students be removed from the school. See also N.J.S.A. 18A:36A-8(b) (prohibiting such a measure).

According to the certification of the school's principal, in the 2017-18 school year, fifty-nine Latino students and fifty-eight white students were enrolled with a sibling preference, indicating that Latino students at the school are equally likely to have another sibling at the school as a white student. The record does not tell us exactly how many students in the most recent prekindergarten class, which is sixty percent Latino, received a sibling preference.

For the sake of discussion, if, hypothetically, the prekindergarten class consists of twenty students, then about twelve of them probably are Latino, and about seven or eight probably are white. According to the school-wide data and the information from the "school lead," about half of those prekindergarten students would have an older sibling at the school. If sibling preference were eliminated, one might expect that about half of the approximately twelve Latino children (i.e., six children) would possibly lose their seats in the class, while

about half of the approximately seven or eight white prekindergarten children (i.e., three or four) would lose their spots. At most, the Latino composition of the prekindergarten class could only increase from twelve students to twenty, a maximum net gain of eight students. When compared with the total enrollment in the school of 200, such a maximum gain of eight Latinos (i.e., four percent) in a particular year is limited at best.

The Commissioners did not misapply their discretion in declining to cease the sibling preference, given this minor effect on the overall enrollment demographic. Moreover, a cessation of sibling enrollment could easily have detrimental impacts on the Latino applicants seeking to join their siblings at the school, an important cohort that the Coalition does not represent.

Lastly on this point, we accept as sincere the express committal of the successive Commissioners to monitor these trends closely, and to step in and make adjustments as may be needed. The annual assessment process prescribed by N.J.S.A. 18A:36A-16(a) and N.J.A.C. 6A:11-2.2(c) and mandates such review, including any segregative effects of enrollment practices.

For these many reasons, we affirm the respective Commissioners' rejection of the Coalition's request to suspend the sibling preference policy. The rejection is amply supported by the record and cogent reasons. Moreover, the

DOE has the power to take remedial interim action if the positive trend towards diversity materially ebbs.

### 3. Omission of Express Findings Concerning Alleged Intentional Discrimination and Shortcomings in Advertising

The Coalition additionally maintains that the Commissioners' decisions critically omit express findings that address the so-called "whisper campaign" to encourage white applicants, and the claimed shortcomings of RBCS's efforts to advertise the application process to parents in the local Latino community with school-aged children. The Coalition asserts in this regard that the Commissioners have a constitutional and statutory obligation to make express findings about these issues, and to state whether or not there is sufficient evidence of intentional discriminatory practices.

To cure these alleged omissions, the Coalition seeks a further remand to the DOE to afford the Commissioner another chance to address these issues with explicit findings. Although in its brief on appeal, the Coalition requested a remand for an "evidentiary" hearing, at oral argument on the appeal its counsel clarified that it is not seeking a formal administrative hearing in the OAL, but instead an unspecified less-formal process for the Commissioner to delve more deeply into these factual allegations and perhaps to speak with persons having information about the subjects.

To be sure, the record does contain a considerable amount of hearsay in the form of unsworn parent letters, as well as a quotation from a Board member uttered several years ago that may have limited evidential value. On the other hand, the Coalition acknowledged at oral argument on the appeal that it has no evidence that the lottery process has been manipulated in a corrupt fashion, or that Latino students have been denied admission through any such corruption.

We agree with the Coalition that some of the factual allegations it has presented may be indicative of problems with the timing and content of the school's advertising and recruitment process, and may warrant a closer look by the DOE. Among other things, the amplifications did not resolve whether timely mailings went to the full boundaries of the school district, and whether Spanish-language signs advertising the application deadline had been adequately translated to match those in English.

It is fairly implicit in the two amplifications that neither Commissioner was persuaded from the documentary record that intentionally discriminatory practices are presently occurring in RBCS's enrollment process. Even so, we remand this appeal to the Commissioner one more time, on an expedited basis, to consider the Coalition's specific factual allegations and afford the Commissioner the opportunity to issue a third amplification. The Commissioner

is not required to conduct or request an evidentiary hearing, as we are not yet convinced (without deciding the legal question) that, under present case law, such an evidentiary hearing can be compelled in the context of a quasi-legislative charter renewal. Quest Academy, 216 N.J. at 384-85 (explaining the quasi-legislative nature of such decisions). We recognize that in 2004 we remanded the case for a hearing, and that the then-DOE Commissioner apparently referred the dispute thereafter to the OAL, where the matter settled three years later. Red Bank Charter, 367 N.J. Super. at 486. We are uncertain, and need not reach here, whether the Supreme Court's more recent opinion in Quest Academy, 216 N.J. at 383-85, precludes a court-ordered evidentiary hearing.

In any event, given the fact that the first three years of this school's five-year charter have already passed, we are not convinced of the practicality and wisdom of conducting further development of the existing record concerning the 2017-2022 charter at a time not long before RBCS's anticipated charter renewal application is filed in the fall of 2021. We instead request the Commissioner to make explicit findings based solely on the existing administrative record,[11] and

---

[11] The record should include all of the items listed within the Statement of Items. Within ten days, counsel shall furnish the Commissioner with courtesy copies

A-3342-16T1

to communicate those findings in a third written amplification by no later than December 15, 2019. Following that third amplification, any aggrieved party may file a new appeal from that amplified determination. We do not retain jurisdiction, and the present appeal is deemed concluded.[12]

Our disposition is without prejudice, however, to two other important avenues for potential reform and remedial action.

First, as respondents acknowledge, the Coalition or "any individual or group" may bring a complaint pursuant to N.J.S.A. 18A:36A-15 alleging violations of the CSPA. Such a complaint initially shall be presented to the RBCS Board of Trustees. Ibid. If the complainant believes that the trustees have not adequately addressed the complaint, the statute requires the Commissioner to "investigate and respond to the complaint." Ibid. Although we need not resolve the question here, respondents' counsel at oral argument appeared to acknowledge that, if a "contested case" under the Administrative Procedure Act, N.J.S.A. 52:14B-9(a), is generated by such a grievance due to

---

of their appellate briefs and appendices, which should obviate the need for any other submissions and help expedite the remand.

[12] We need not address in this appeal concerning RBCS's charter renewal appellants' generic criticisms of the State's standardized testing methods. Those issues are more appropriately raised in a different context with an appropriate record.

the existence of factual disputes, the Commissioner may refer such a dispute to the OAL. The results of such an OAL hearing may aid the DOE in its ongoing oversight.

A second important avenue to underscore is that these dynamic factual issues may be considered anew in the forthcoming charter renewal process. Under N.J.A.C. 6A:11-2.3(b), RBCS must submit its charter renewal application to the DOE by October 15, 2021. In the meantime, more incoming classes at RBCS will be selected and more data generated. That additional data may well shed further light on whether the weighted lottery is working in a desirable fashion, and whether the school's most recent advertising measures to the community are timely and effective.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3342-16T1